IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| DEVIN G. NUNES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case 1:19-cv-1148-LO-TCB |
| | ) | |
| | ) | **TRIAL BY JURY** |
| FUSION GPS a/k/a BEAN, LLC | ) | **IS DEMANDED** |
| | ) | |
| -and- | ) | |
| | ) | |
| GLENN SIMPSON | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# SECOND AMENDED COMPLAINT

Plaintiff, Devin G. Nunes ("Plaintiff"), by counsel, pursuant to the Court's Order entered February 21, 2020, General Order No. 3, and Rule 15(a)(2) of the Federal Rules of Civil Procedure (the "Rules"), files the following Second Amended Complaint against defendants, Fusion GPS a/k/a Bean, LLC ("Fusion GPS") and Glenn Simpson ("Simpson"), jointly and severally.

Plaintiff seeks (a) compensatory damages, statutory damages (threefold the actual damages sustained), and punitive damages in the sum of **$9,900,000.00**, plus (b) prejudgment interest on the principal sum awarded by the Jury at the rate of six percent (6%) per year from January 25, 2018 pursuant to § 8.01-382 of the Virginia Code (1950), as amended (the "Code"), (c) a reasonable attorney's fee, (d) post-judgment interest, and (e) court costs – arising out of the Defendants' acts of racketeering activity in violation of

1

Title 18 U.S.C. § 1962(c), conspiracy to violate Title 18 U.S.C. § 1962(c), tortious interference with contract and business expectations, and common law conspiracy to tortiously interfere with Plaintiff's business as a United States Congressman and, in particular, his position as Chairman of the House Intelligence Committee.

In addition to money damages, Plaintiff seeks declaratory and injunctive relief pursuant to Title 18 U.S.C. § 1964(a). Plaintiff requests a declaratory judgment that Fusion GPS and Simpson's conduct constitutes racketeering activity within the meaning of Title 18 U.S.C. § 1961(1). Plaintiff also seeks prospective injunctive relief to prevent and restrain the Defendants, *inter alia*, from engaging in the same type of endeavor as the enterprise engaged in.

## I.  INTRODUCTION

1.     This case involves an illegal enterprise that engages in active, coordinated and ongoing corruption, fraud and obstruction of justice – wrongdoing (a) admitted to by Defendants in a book written by Simpson and his partner, Peter Fritsch ("Fritsch"), titled, ironically, *Crime in Progress: Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump ("Crime in Progress")*, (b) chronicled in the detailed December 2019 report of the Office of the Inspector General, and (c) described in detail by multiple victims of Fusion GPS' common scheme and plan of criminal operations.

2.     Plaintiff is a prominent United States Congressman who, in 2018, was Chairman of the House Permanent Select Committee on Intelligence (the "Committee"). In 2018, Fusion GPS and Simpson implemented a scheme to obstruct and impede Plaintiff in the performance of his duties as Chairman of the Committee. Consistent with an established *modus operandi* or business model, deployed against multiple other victims,

Defendants undertook a media campaign to depict Plaintiff as a criminal who was unfit to lead the Committee in its important oversight of the United States intelligence community and, in particular, its investigation of Russian interference in the 2016 Presidential election. In order to effectuate the obstruction scheme, the Defendants associated in fact and colluded with certain media sympathizers and shadowy non-profit organizations and political operatives.  The goals of the enterprise were and are to intimidate, harass, threaten, influence, interfere with, impede, and ultimately to derail Plaintiff in the performance of his official duties and business as Chairman of the Committee and as a United States Congressman, and to prevent Plaintiff from making criminal referrals to DOJ.

3.      At all times relevant to this action, the Defendants controlled, directed and participated in the business and affairs of the illegal obstruction enterprise and received substantial income from the operations of the enterprise.  Between 2018 and the present, Defendants engaged in multiple acts of wire fraud in violation of Title 18 U.S.C. § 1343 and acts of obstruction of justice in violation of Title 18 U.S.C. §§ 1503(a), 1512(b), 1512(d) and 1513(e).  In furtherance of their conspiracy to obstruct justice, the Defendants, acting in concert with others, engaged in a vicious political operation to "dirty up" Plaintiff and to undermine confidence in him as Chairman of the Committee – a coordinated operation that included the nationwide publication of fraudulent news stories and the filing of fraudulent and retaliatory "ethics" complaints against Plaintiff.

4.      This lawsuit challenges Defendants' obstruction of the lawful investigations of a sitting United States Congressman through their unlawful enterprise.  Plaintiff brings this action (a) to recover money damages for the injury caused by Defendants' racketeering activity, (b) for disgorgement of the ill-gotten gains and fruits of Defendants' unlawful

enterprise, (c) to recover money damages caused by Defendants' conspiracy to tortiously interfere with Plaintiff's employment and business and for Defendants' intentional interference with that business, (d) to impose reasonable restrictions on Defendants' future activities, including Defendants' use of fraudulent "opposition research", media smear campaigns and fraudulent "ethics" complaints to intimidate members of Congress and other law enforcement officers in the performance of their official duties, (e) to declare Defendants' activities to be in violation of Title 18 U.S.C. § 1962 and to enjoin Defendants' prospectively from obstructing justice, and (f) to order the dissolution or reorganization of Fusion GPS so as to prevent or restrain the Defendants from committing fraud, lying to the Federal Bureau of Investigation ("FBI"), Department of Justice ("DOJ"), Congress and Senate, obstructing justice, and violating Title 18 U.S.C. § 1962 in the future.

## II.  PARTIES

5.     Plaintiff has served in the United States House of Representatives since 2003.  He represents California's 22nd Congressional District, which is located in the San Joaquin Valley and includes portions of Tulare and Fresno Counties.  He is the author of the book, *Restoring the Republic*, which was published in September 2010.  Plaintiff now serves as Ranking Member of the House Permanent Select Committee on Intelligence, having been appointed to the Committee in the 112th Congress and serving as Committee Chairman during the 114th and 115th Congresses.  As a member of the Committee, he participates in oversight of the United States national security apparatus, including the intelligence-related activities of seventeen agencies, departments, and other elements of the United States Government, most of which are located in Virginia within the Alexandria Division.  [https://nunes.house.gov/about/; https://www.devinnunes.com/bio].

6.     Created in 1977, the Committee oversees the nation's intelligence agencies, including components of the Departments of Defense, Homeland Security, Justice, State, Treasury and Energy. Consistent with its mission and jurisdiction, the House Intelligence Committee has the authority and power, *inter alia*, to conduct investigations, issue subpoenas for the production of memoranda, documents and records or other material, to compel testimony from witnesses, and to make criminals referrals to the DOJ. [https://republicans-intelligence.house.gov/uploadedfiles/hpsci_rules_of_procedure_-_115th_congress.pdf; https://www.govinfo.gov/content/pkg/HMAN-115/pdf/HMAN-115.pdf]. On March 1, 2017, the Committee approved a bipartisan "Scope of Investigation" to guide the Committee in its investigation into the Russian active measures campaign that targeted the 2016 U.S. Presidential Election. Plaintiff confirmed that the "Intelligence Committee has been investigating Russia for years and warning about the Putin regime's hostile international actions, its aggression in cyber space, and its influential international propaganda campaigns. The committee is determined to continue and expand its inquiries into these areas, including Russian activities related to the 2016 U.S. elections. On a bipartisan basis, we will fully investigate all the evidence we collect and follow that evidence wherever it leads." In its investigation, the Committee publicly vowed to conduct interviews, take witness testimony and to "seek access to and custody of all relevant information, including law enforcement and counterintelligence information, consistent with the Committee's oversight jurisdiction and investigative responsibilities." [https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=217].

7.      Defendant, Fusion GPS, is a Delaware limited liability company headquartered in Washington, D.C.   Fusion GPS represents that it "provides premium research, strategic intelligence, and due diligence services to corporations, law firms, and investors worldwide." [http://www.fusiongps.com/].  In truth, Fusion GPS is a political war room for hire that specializes in dirty tricks, retaliation and smears on behalf of its undisclosed clients.  As admitted in *Crime in Progress*, one of Fusion GPS's main targets in 2018 was Plaintiff.  Fusion GPS has agents and transacts its affairs in Virginia.  Upon information and belief, many of Fusion GPS' clients and donors are located in Virginia. Fusion GPS repeatedly uses the same means and methods as part of its business:  it creates fake "dossiers" and supplies the fraudulent documents and information to "friendlies" in the media for dissemination online and via social media.  In 2018, for instance, Fusion GPS used newspaper conglomerate, The McClatchy Company and its subsidiary McClatchy Newspapers, Inc. (collectively, "McClatchy"), as a media sympathizer and conduit to propagate falsehoods and obstruct Plaintiff in the performance of his duties as Chairman of the Committee.  Another technique employed by Fusion GPS as part of its obstruction and interference schemes is "astro-turfing".   Astroturfing is the attempt to create an impression of widespread grassroots support for a position, where no such support actually exists.  Fusion GPS uses multiple "cut-outs", online identities and fake pressure groups to mislead the public into believing that its positions on behalf of its undisclosed clients are correct and/or commonly held.  Campaign for Accountability, Inc. ("CfA") is a "cut-out"

regularly used by astroturfers like Fusion GPS. [https://fortune.com/2016/08/19/google-transparency-project-2/].[1]

8.    Defendant, Simpson, is a citizen of the United States.  He is a principal of Fusion GPS.  Simpson manages Fusion GPS and is its "public" face.  In 2016, Fusion GPS engaged Orbis Business Intelligence, Ltd. ("Orbis") and Christopher Steele ("Steele") to manufacture a compendium of fake "intelligence" reports – a "dossier" – that Simpson and Steele provided to the FBI and DOJ and then leaked to mainstream media outlets, for the express purpose of instigating and promoting the false narrative that the Trump campaign or persons associated with it colluded with Russians. [https://gop.com/meet-fusion-gps/].

---

[1]    CfA is a dark money, partisan, left-wing 501(c)(3) nonprofit organization that uses the Freedom of Information Act, litigation, and "aggressive communications" to target government officials, principally conservative Republicans such as Plaintiff. [https://campaignforaccountability.org/about/].  CfA was founded in 2015 by alumni of prominent left-wing opposition research super PAC, American Bridge 21st Century, and Citizens for Responsibility and Ethics in Washington (CREW), an "advocacy group" that uses "aggressive legal action, in-depth research, and bold communications" to target Republican officeholders. [See https://www.citizensforethics.org/who-we-are/].  CfA claims (ironically) that it "works on behalf of the public interest to expose corruption, negligence and unethical behavior wherever it may occur."  As part of its business, CfA operates a website, a Twitter account (@Accountable_Org), a Facebook account, a YouTube channel, and publishes articles via Medium.  In 2017, CfA received a total of $994,811 in contributions and grants.  In 2018, CfA received a total of $1,270,480 in contributions and grants.  CfA does not disclose the identities of its donors.  However, it has been widely reported that one of CfA's major donors is the left-wing funding/incubation non-profit, New Venture Fund. [https://www.influencewatch.org/non-profit/new-venture-fund/; http://www.siliconbeat.com/2016/07/19/googles-secretive-and-deep-pocketed-foe-heavily-funded-by-gates-hewlett-foundations/].  All three (3) CfA "ethics" complaints against Plaintiff at issue in this action are directly connected to Fusion GPS.  The first complaint was for allegedly leaking information on Fusion GPS; the second was for allegedly leaking text messages from and to Adam Waldman, a lawyer for Christopher Steele; and the third complaint was about wineries that Fusion GPS just happened to be researching and spreading lies about.  In 2018, CfA engaged Fusion GPS as an "independent contractor".  CfA paid Fusion GPS nearly $140,000 for unspecified "research".        [https://dailycaller.com/2019/08/01/liberal-watchdog-fusion-gps-trump/] ("**Liberal Watchdog Group That Targeted Google And Devin Nunes Paid Fusion GPS $140K For Research**")].

At all times material to this case, Simpson and Fusion GPS shared a common goal with the Democratic National Committee ("DNC") and the Hillary Clinton presidential campaign of using the false and defamatory statements in the Steele/Fusion "dossier" to maliciously instigate an FBI investigation into imaginary "collusion" between "Russians" and the Trump campaign, to poison the minds of voters against candidate Donald Trump ("Trump"), and to influence the outcome of 2016 Presidential Election.

9.     On November 25, 2019, Simpson released *Crime in Progress*.  In his book, Simpson, *inter alia*, admitted to targeting Plaintiff and to engaging in active measures to interfere with and obstruct Plaintiff in the performance of his official duties as Chairman of the Committee.   Plaintiff was a threat to Fusion GPS' clients.   Fusion was paid to eliminate the threat.   Simpson's book provides clear examples of Fusion GPS' efforts to obstruct justice, *e.g.*:

- "Fusion ordinarily didn't work on congressional races, but as the [2018] election drew closer, the firm began to mull a few ways it could have an impact.  Later, it would decide to design and launch a more systematic cyber-monitoring campaign, but first it went small, focusing on a single congressional district in California's heavily agricultural Central Valley. That solidly red seat happened to have been occupied since 2003 by one Devin Nunes". [pp. 292-294].

- "Fusion had no illusions about being able to topple Nunes, but the notion of digging into his record made many at the firm salivate.  His bumbling investigation of Trump-Russia was amusing, in some respects, and Fritsch had taken up Senator Lindsey Graham's reference to him as Inspector Clouseau, after the incompetent police inspector in the Pink Panther movies. But there were far more serious issues at stake here, too: In his fiercely partisan stewardship of the Russia investigation, Nunes had also undermined the intelligence and law enforcement agencies and inflicted damage on dedicated crime fighters like Bruce Ohr.  And he was a threat to Mueller's ability to do his job.  When Fritsch asked Fusion staff for volunteers to look into Nunes, every hand shot up". [p. 294].

- "While he described himself as a farmer on the midterm ballot, Nunes hadn't been one for a decade.  Three years after he was first elected, he had quietly sold off his shares of the family farm and invested the proceeds in a Napa Valley winery nearly two hundred miles from his district". [p. 295].[2]

- "Some of his spending appeared to violate campaign finance rules.  Fusion discovered 'fundraising' trips to Las Vegas and Boston during which Nunes spent more than $130,000 on high-end hotels, meals, and NBA tickets, at the expense of his campaign committees.  The Boston fundraisers appeared to have been outings to see his favorite NBA team, the Boston Celtics. (Nunes idolized Larry Bird).  In March 2018, Fusion found, Nunes charged more than $11,000 to his campaign for a private plane charter, despite House ethics rules that generally forbid noncommercial travel". [p. 295].

- "Nunes also spent tens of thousands of dollars in PAC money on wine from the wineries in which he held stakes". [p. 295].

- "In the end, Fusion found an obscure bit of litigation that lit up the race.  In May, weeks after that discovery, Nunes's ownership stake in the Napa winery Alpha Omega became national news when The Fresno Bee reported on a lawsuit filed in California state court by a young woman who had worked serving wine at a 2015 tasting event abord the winery's sixty-two-foot yacht" [pp. 295-296].

- "Nunes spent tens of thousands of dollars on television, radio, and Facebook advertisements attacking the Bee for its coverage of the lawsuit, drawing more attention to the case.  In the end, Nunes would win re-election in November with 52.7 percent of the vote, his lowest margin of victory ever". [p. 296].

---

[2]     For every Fusion GPS "research" project, there is a corresponding "ethics" complaint levelled against Plaintiff by a "non-profit" working with Fusion GPS as part of the obstruction enterprise.  On June 8, 2018, non-profit, American Democracy Legal Fund ("ADLF"), filed a complaint with the Office of Congressional Ethics ("OCE") over McClatchy's "yacht" story.  On July 11, 2018, CfA filed a complaint with OCE relating to his investment in the Napa Valley winery.  On July 11, 2018, non-profit, Swamp Accountability Project ("Swamp"), operated by political operative Liz Mair, filed a complaint with OCE over the "yacht" story.  On July 23, 2018, non-profit, Campaign Legal Center ("CLC"), filed a complaint with the Federal Election Commission ("FEC") over Plaintiff's private jet travel.  And, on August 9, 2018, Paul Buxman, Daniel O'Connell and Hope Nisly sued Plaintiff over his ballot designation as a farmer.

10.     On December 9, 2019, the Office of the Inspector General, United States Department of Justice, released its "**Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation**" (the "IG Report"). [https://www.justice.gov/storage/120919-examination.pdf].[3]   The IG Report confirmed that the Steele/Fusion "dossier", bought and paid for by the Hillary Clinton campaign and the DNC, was a complete fabrication.  The IG Report confirms that the putative author[4] of the "dossier", Steele, told FBI agents at a meeting in Rome that his reports were raw intelligence, not vetted information, and that a person passing some of the most important information to him was a "boaster" and "egotist" who might well "engage in some embellishment."   That alarming description never made it to DOJ, where officials were using some of Steele's reports to support a secret court order authorizing surveillance on a former Trump campaign aide, Carter Page ("Page").   The IG Report further reveals that the Central Intelligence Agency ("CIA") dismissed the Steele "dossier" as "internet rumor."   And when the FBI eventually interviewed the person described as Steele's "primary subsource," that subsource claimed that Steele's reports had gone far beyond what he had been told.  The source, who is not identified in the IG Report, "raised doubts about the reliability of Mr. Steele's descriptions of information in his election reports," saying Mr. Steele had "misstated or exaggerated" what he had been told.  Though Steele represented that Donald Trump's supposed 2013 encounter with Russian prostitutes had

---

[3]     Two witnesses, Simpson and Jonathan Winer, refused to be interviewed for the IG Report.

[4]     Fusion GPS tasked Nellie Ohr to research then-candidate Trump and his Russian business associates, which involved searching Russian and other foreign language websites and databases and providing periodic reports detailing her findings.   Nellie stopped working for Fusion GPS on September 24, 2016.  Upon information and belief, Nellie and/or Simpson authored intelligence reports that Steele included in the "dossier".

been "confirmed" by a hotel staff member, the IG Report revealed that source actually told the FBI that the story of the purported episode at Moscow's Ritz Carlton was just "rumor and speculation."  Similarly, the source had passed on information about a visit to Moscow during the presidential campaign by Page.  But the source told FBI agents that he had given Steele no evidence to support one of the most incendiary claims about Page in the "dossier":  that Page had been offered a lucrative brokerage fee in the sale of part of the Russian oil giant Rosneft.  Another of Steele's claims that drew wide media coverage was that candidate Trump's personal lawyer, Michael D. Cohen ("Cohen"), had traveled to Prague during the 2016 campaign to meet with Russian agents and discuss the hacking of the Democrats.  The IG Report flatly concluded that the claim was "not true."

11.  Steele considered Donald Trump to be his "main opponent", as did Fusion GPS and its clients, the law firm Perkins Coie, the DNC and the Clinton campaign.  Steele was "desperate" that Donald Trump not get elected, as was Fusion GPS, Perkins Coie, the DNC and Hillary Clinton.  The outright fabrications in the Steele "dossier" are the product of a joint collaborative effort between Steele and Fusion GPS.  Steele and Fusion GPS, acting in concert, lied to the FBI and spread lurid and fake anecdotes in order to provoke an FBI investigation of then-candidate Trump for allegedly engaging in a treasonous conspiracy with Russia.  Fusion GPS and Steele wanted to make it appear to the FBI that there was a "crime in progress", when, it truth, it was all a coordinated hoax.

12.  Fusion GPS' fabrication of raw intelligence about targets, including the President and Plaintiff, and the misrepresentation and concealment of information provided by sources is an ordinary part of Fusion GPS' criminal operations, and one that threatens to persist in the future.

11

### III.  JURISDICTION AND VENUE

13.   The United States District Court for the Eastern District of Virginia has subject matter jurisdiction over this action pursuant to Title 28 U.S.C. § 1331 (Federal Question), § 1332 (Diversity) and § 1367 (Supplemental Jurisdiction).  The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

14.   Title 18 U.S.C. § 1965(a) provides that "any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs."  Section 1965(d) authorizes service of process in any judicial district in which the defendant resides, is found, has an agent, or transacts his affairs.  The Fourth Circuit has determined that § 1965(d) authorizes nationwide service of process and, thus, the exercise of personal jurisdiction in any district court. *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997) (cited in *D'Addario v. Geller*, 264 F.Supp.2d 367, 387 (E.D. Va. 2003) ("As there is no evidence in the record suggesting extreme inconvenience or unfairness in litigating in this forum, *in personam* jurisdiction comports with due process in this case.")); *Hengle v. Curry*, 2018 WL 3016289, at * 9 (E.D. Va. 2018) ("there is no evidence that any defendant would suffer extreme inconvenience or unfairness from litigating in the Newport News Division.  Defendants have conducted their business in connection with the underlying dispute in states like Oklahoma, Delaware, and New York. Even if there would be some inconvenience in having to defend the action in Virginia instead of one of those states, 'it is not so extreme as to defeat the exercise of personal jurisdiction pursuant to valid service of process, although it may certainly factor into a

transfer decision'"). Fusion GPS and Simpson have agents and transact continuous and systematic business and affairs in Virginia. Fusion and GPS are subject to general jurisdiction and specific jurisdiction in Virginia. The exercise of personal jurisdiction over them comports with 18 U.S.C. § 1965, traditional notions of fair play and substantial justice and is consistent with the Due Process Clause of the United States Constitution.

15.     Venue is proper in the Alexandria Division of the United States District Court for the Eastern District of Virginia pursuant to Title 18 U.S.C. § 1965(a) and Title 28 U.S.C. § 1391(b). Many of the key witnesses to the Defendants' corrupt business practices – including former FBI director, James Comey ("Comey"), Andrew McCabe ("McCabe"), Bruce Ohr (expressly referenced in *Crime in Progress*) and his wife, Fusion GPS contractor, Nellie Ohr, and Liz Mair – reside in Virginia or did so at the time of the acts or occurrences at issue in this action.

## IV.   STATEMENT OF THE FACTS

**A.     *Pattern Of Racketeering Activity – Fusion GPS' Regular Way Of Doing Business***

16.     Over the past decade, Defendants have undertaken multiple schemes and have participated in multiple criminal enterprises for the purpose of destroying their targets' businesses and obstructing justice. Plaintiff is the latest victim.

**1.     *Thor Halvorssen***

17.     In 2011, Thor Halvorssen ("Halvorssen"), a prominent human rights advocate, began to investigate the illicit business of Derwick Associates ("Derwick"), a Venezuelan company engaged in the construction of power plants. Derwick was owned by Francisco D'Agostino-Casado ("D'Agostino") and others. Halvorssen learned that Derwick had received billions of dollars through over-billing the Government of Venezuela

for construction of power plants, and that it had provided large kickbacks to Venezuelan government officials for the contracts. D'Agostino acknowledged to Halvorssen that the owners of Derwick paid kickbacks disguised as "consulting fees" to Venezuelan public officials. Thereafter, Halvorssen discovered many more details concerning Derwick's illegal activities. In August 2015, Halvorssen reported to various federal law enforcement officials that D'Agostino had played a role in Derwick's bribery and corruption.

18. After Halvorssen reported that D'Agostino had committed numerous federal crimes in conjunction with Derwick, including violations of the Foreign Corrupt Practices Act and money laundering, D'Agostino and his associates retaliated against Halvorssen. D'Agostino and Derwick engaged Fusion GPS and Simpson to produce a fake "dossier" on Halvorssen and to undertake a media campaign (including a social media campaign) to depict Halvorssen as a pedophile, heroin addict, and embezzler. In furtherance of the conspiracy to defame and discredit Halvorssen, Fusion GPS and Simpson manufactured a series of fake stories about Halvorssen and gave the "dossier" to a "friendly" journalist, Kenneth M. Silverstein, who published the "profile' of Halvorssen repeatedly on the Internet and via social media (Facebook).

19. The conspiracy to retaliate against Halvorssen for his report to federal law enforcement officials about the Derwick bribes and money laundering violated Title 18 U.S.C. § 1513(e) and (f).

**2.** ***Aleksander Boyd***

20. Aleksander Boyd ("Boyd"), a prominent journalist reporting on corruption and human rights violations, was the single most significant adversary Derwick encountered in the media. Boyd widely reported on Derwick's corrupt business practices.

[https://www.tabletmag.com/jewish-news-and-politics/241812/news-for-hire-scandal-deepens-gps-fusion-sleazy-venezuela-links-shed-new-light-on-trump-dossier].

21.     In 2014, Derwick and D'Agostino retained Fusion GPS to smear Boyd and discredit his work, so that Boyd could not longer obtain online donations from the public to continue his investigations and blogs.  Simpson and Fritsch produced a "dossier" on Boyd that would serve as the template for a series of vicious articles.  The "dossier" was widely disseminated, including to the Venezuelan media who referred to Boyd as a drug trafficker, car thief, rapist, and wanted criminal.  Almost overnight, dozens of blogs, websites and videos were published that contained fake police file and false arrest records, bogus mugshots, and false narratives calling Boyd a pedophile, a drug addict, car thief, rapist and embezzler.

   **3.**     ***William Browder***

22.     William Browder ("Browder"), an American-born British citizen who had a successful career as an investor with Hermitage Capital Management, was similarly targeted by Fusion GPS and Simpson.

23.     In 2008, Browder's Moscow-based tax specialist, Sergei Magnitsky ("Magnitsky"), discovered a $230 million tax fraud scheme carried out by corrupt Russian government officials and their cronies against the Russian treasury.  After Magnitsky fled a complaint with seven different Russian agencies, he was arrested and turned over to the very officials he had accused of fraud.  He was placed in pre-trial detention in a Moscow prison.  He died in prison in 2009, after being beaten to death by the guards.  Thereafter, Browder began a world-wide lobbying campaign for the enactment of sanctions against the Russians who were responsible for the murder.  The legislation Browder sponsored was

known as the Magnitsky Act.  It was enacted by Congress and signed into law in 2012.

Browder continued to focus media and law enforcement attention on the theft of the $230

million.  [*See*   https://www.c-span.org/video/?431852-1/william-browder-overturning-

magnitsky-act-putins-top-priority].

24.     One of the entities used to launder a part of the stolen $230 million was

Prevezon Holdings Ltd. ("Prevezon").  Prevezon invested part of the stolen funds in real

estate in New York City.   In 2013, Browder reported the money laundering to the

Department of Homeland Security.  Based largely on Browder's report and documents he

provided, DHS began a civil forfeiture proceeding against Prevezon.

25.     Shortly after the United States Government filed the forfeiture action,

Prevezon's Russian lawyer, Natalya Veselnitskaya ("Veselnitskaya"), hired Fusion GPS to

investigate Browder, assemble a "dossier" on him, and use the dossier to retaliate against

Browder for reporting Prevezon's crimes to the United States Government.  The goal of

the retaliation was to protect the corrupt Russian citizens responsible for the theft of the

$230 million and for Magnitsky's death by smearing and discrediting Browder.

26.     As with Halvorssen and Boyd, Simpson and Fusion GPS assembled a

"dossier" on Browder which they disseminated in journalistic circles in 2015 and 2016 to

harm Browder.  In Browder's case, Fusion GPS's media "friendly" was NBC and Ken

Dilanian ("Dilanian").   Dilanian's "reporting" moved in tandem with Fusion FPS's

campaign to discredit Browder and Magnitsky. [https://thefederalist.com/2017/10/10/u-s-

media-help-russia-destabilize-united-states/ ("**Does U.S. Media Help Russia Destabilize**

**The United States**")].  Simpson and Fusion GPS also provided the Browder "dossier" to

16

Russian intelligence who provided it to Russia's chief prosecutor with the aim to abet Browder's prosecution and the collapse of his business.

###    4.   *Donald J. Trump*

27.    On April 12, 2015, Hillary Rodham Clinton declared her candidacy for President of the United States.  She officially received the nomination of the Democratic Party on July 26, 2016 at the Democratic National Convention.

28.    During the 2016 presidential campaign, Perkins Coie, on behalf of and with the knowledge and authority of the Clinton campaign and the DNC, paid Fusion GPS to create a false narrative about opposition Republican presidential candidate Donald Trump. [https://www.nytimes.com/2017/10/24/us/politics/clinton-dnc-russia-dossier.html

("**Clinton Campaign and Democratic Party Helped Pay for Russia Trump Dossier**");

https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/226fabf0-b8e4-11e7-a908-a3470754bbb9_story.html].[5]

_____

[5]    The revelation that the Clinton campaign and the DNC had paid Fusion GPS emerged from an October 24, 2017 letter by Perkins Coie.  In pertinent part, the letter states:

> "Fusion GPS approached Perkins Coie in early March of 2016 and … expressed interest in an engagement with the Firm in connection with the 2016 presidential election to continue research regarding then-Presidential candidate Donald Trump, research that Fusion GPS had conducted for one or more other clients during the Republican primary contest … To assist in its representation of the DNC and Hillary for America, Perkins Coie engaged Fusion GPS".

[https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/226fabf0-b8e4-11e7-a908-a3470754bbb9_story.html; https://assets.documentcloud.org/documents/4116755/PerkinsCoie-Fusion-PrivelegeLetter-102417.pdf].

29.     In April 2016, Perkins Coie engaged Fusion GPS on behalf of the Clinton campaign and the DNC to prepare a salacious "dossier" that could be used to smear Trump. Perkins Coie chose Fusion GPS to smear opposition candidate Trump because of Fusion GPS' well-documented history of defamation, dirty tricks and its pattern and practice of using fabricated "dossiers" and the media to intimidate and smear targets. [*E.g.* https://www.wsj.com/articles/SB10001424052702304203604577397031654422966

("**The President's Hit List**");   https://www.scribd.com/document/354721041/Testimony-of-Thor-Halvorssen-to-the-Senate-Committee-on-the-Judiciary-7-26-2017   ("Thank you for the opportunity to provide testimony about Fusion GPS, its role in a multi-billion-dollar corruption case benefitting the Venezuelan regime, and how they violate [FARA]"); http://infodio.com/20170114/fusion/gps/derwick/associates/venezuela/corruption

("**Fusion GPS link to Derwick Associates: Venezuela's most corrupt criminal gang**"); https://www.theatlantic.com/politics/archive/2017/07/bill-browders-testimony-to-the-senate-judiciary-committee/534864/   ("Veselnitskaya, through Baker Hostetler, hired Glenn Simpson of the firm Fusion GPS to conduct a smear campaign against me and Sergei Magnitsky in advance of congressional hearings on the Global Magnitsky Act.   He contacted a number of major newspapers and other publications to spread false information that Sergei Magnitsky was not murdered, was not a whistle-blower, and was instead a criminal.   They also spread false information that my presentations to lawmakers around the world were untrue.");   https://thefederalist.com/2017/10/10/u-s-media-help-russia-destabilize-united-states/   ("**Does U.S. Media Help Russia Destabilize The United States?**")].

18

30.     Fusion GPS hired Orbis to create the "dossier" to smear Trump and help in disseminating the scandalous accusations to the media.   Steele, acting in concert and combination with Fusion GPS, created a compendium of "Company Intelligence Report[s]" that Simpson and Steele ultimately delivered to the FBI for the purpose of provoking an FBI investigation into Trump's alleged collusion with Russia.   The various "Company Intelligence Report[s]" that are part of the "dossier" manufactured by Steele and Fusion GPS are complete fabrications.   Fusion GPS paid Orbis approximately $170,000 for the fraudulent Steele "dossier".

31.     Between July 31, 2016 and September 23, 2016, Fusion GPS and Simpson, acting in concert with Steele, leaked the Steele "dossier" to the FBI, DOJ, State Department, and multiple "journalists" who were friendly to presidential candidate, Clinton.   By September 23, 2016, the so-called "dossier" had been shown to at least nine (9) media outlets, including the *Wall Street Journal*, *Washington Post*, the *New Yorker*, McClatchy, and *Yahoo News*. [https://www.washingtonpost.com/politics/hero-or-hired-gun-how-a-british-former-spy-became-a-flash-point-in-the-russia-investigation/2018/02/06/94ea5158-0795-11e8-8777-2a059f168dd2_story.html].

32.     Steele was "desperate" to see Donald Trump defeated in the 2016 Presidential election. [https://thehill.com/opinion/white-house/425739-fisa-shocker-doj-official-warned-steele-dossier-was-connected-to-clinton (Associate Deputy Attorney General Bruce Ohr ("Bruce Ohr") told congressional investigators that "Christopher Steele was, as I said, desperate that Trump not be elected.")].   Steele's personal bias and lack of veracity was well-known to Fusion GPS and Simpson.   Fusion GPS and Simpson commissioned the Steele "dossier" and leveraged Steele's extreme political bias and

motive to lie.  On October 11, 2016, Steele met with Deputy Assistant Secretary of State

Kathleen Kavalec ("Kavalec").  Steele admitted to Kavalec that his "research" was political

and that he was facing an Election Day deadline to make it public.  Steele told Kavalec that

his "client" (Fusion GPS) was "keen to see this information come to light prior to

November 8," the date of the 2016 presidential election. [https://thehill.com/opinion/white-

house/442592-steeles-stunning-pre-fisa-confession-informant-needed-to-air-trump-dirt].

Notwithstanding is contemporaneous admissions of extreme bias against then-candidate

Trump, Steele lied to the OIG and stated that any claim of bias was "ridiculous".

   33.    On October 21, 2016, the FBI used part of the Steele/Fusion "dossier" –

Company Intelligence Report (CIR) 94 – to seek a warrant to spy on Carter W. Page

("Page") pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA").  The

FISA application, signed by Comey, falsely represented to the FISA Court that the

information in the application was "VERIFIED":

34.     The Steele/Fusion "dossier" accusations of collusion between the Trump campaign or persons associated with it and Russians have never been verified.  They cannot be verified because they are false.  As with the claims made against Halvorssen, Boyd and Browder, Fusion GPS and Simpson manufactured the claims against Trump and members of his campaign out of whole cloth.  The creation of unverifiable "intelligence" is a hallmark of Fusion GPS' ordinary way of doing business.

35.     On January 10, 2017, *Buzzfeed* published the Steele/Fusion "dossier". [https://www.buzzfeednews.com/article/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia;    https://www.nytimes.com/2017/01/11/us/politics/donald-trump-russia-intelligence.html?module=inline].[6]

36.     On January 11, 2017, the *New York Times* revealed that Fusion GPS was behind the "dossier".  [https://www.nytimes.com/2017/01/11/us/politics/donald-trump-russia-intelligence.html?smid=tw-nytimes&smtyp=cur&_r=0].  The *Wall Street Journal* revealed that Steele was the author. [https://www.wsj.com/articles/christopher-steele-ex-british-intelligence-officer-said-to-have-prepared-dossier-on-trump-1484162553].

37.     In 2017, after Trump won the presidential election, the Democracy Integrity Project ("TDIP") paid Fusion GPS and firms tied to it and Steele more than $3.8 million to continue opposition "research" on Trump and alleged "collusion" with "Russia".  TDIP paid $3.3 million to Fusion GPS, another $250,000 to "Walsingham Partners Ltd.", a London-based firm owned by Steele and his partner, Christopher Burrows, nearly $130,000

---

[6]     On January 10, 2017, Ben Smith ("Smith"), editor-in-chief of *BuzzFeed*, advised the staff of *BuzzFeed News* that there were "**real solid reasons to distrust**" the veracity of the allegations contained in the "Trump dossier".  Smith tweeted the note he sent to his staff. [https://twitter.com/BuzzFeedBen/status/818978955965464580/photo/1].

to "Edward Austin Ltd.", a London-based intelligence consultancy operated by Edward Baumgartner, a Fusion GPS contractor, and another $148,000 to the law firm Zuckerman Spaeder, which has represented Fusion GPS in a variety of dossier-related legal matters. Perkins Coie paid $1 million to Fusion GPS in 2016 to investigate Trump. The payments made by TDIP are more than three times what the DNC and the Clinton campaign paid Fusion GPS and Steele during the 2016 presidential campaign to investigate Donald Trump's possible ties to Russia. [https://dailycaller.com/2019/04/01/fusion-gps-steele-soros-millions/].

38.     Fusion GPS and Simpson used the income derived, directly or indirectly, from the racketeering activity in which they engaged to operate the obstruction enterprise. Fusion GPS' dirty tricks and pattern of obstructing justice continued in 2017 and 2018. As revealed in *Crime in Progress*, the main target of retaliation in 2018 was Plaintiff.

**5.      *Interference and Obstruction of Plaintiff's Congressional Investigations***

39.     Like Halvorssen, Boyd and Browder, Plaintiff has been an ardent and outspoken opponent of corruption.

40.     Plaintiff was one of the leading and most vocal members of Congress to advocate for a thorough investigation of the role that Fusion GPS and the Steele/Fusion "dossier" played in advancing the fake "Russia collusion" narrative. Fusion GPS and Simpson harbored spite and ill-will towards Plaintiff as a result.

41.     Using the same corrupt practices employed on Halvorssen, Boyd, Browder, Trump, ***and*** on the FBI before and during operation Crossfire Hurricane, Fusion GPS and

Simpson decided to smear Plaintiff in order to interfere with, impede and ultimately deter his tenacious efforts to expose Fusion GPS' nefarious activities.[7]

42.      On August 24, 2017, in his capacity as Chairman of the House Intelligence Committee, Plaintiff authorized subpoenas to both DOJ and FBI for all documents they had relating to their relationship with Steele and/or the Steele/Fusion "dossier". [http://i2.cdn.turner.com/cnn/2017/images/09/06/chm.ltr.to.ag.sessions.re.subpoena.compliance--1.september.17.pdf].   All subpoenas authorized by Plaintiff were issued pursuant to a constitutionally authorized investigation by a Committee of the U.S. House of Representatives with jurisdiction over intelligence and intelligence-related activities.

43.      In a September 1, 2017 letter to Attorney General, Jeff Sessions ("Sessions"), Plaintiff stated as follows:

> On August 24, 2017, the House Permanent Select Committee on Intelligence ("Committee") served subpoenas on the Attorney General, in his capacity as head of the Department of Justice ("DOJ"), and the Director of the Federal Bureau of Investigation ("FBI") for production of documents relevant to the Committee's ongoing investigation of Russian interference in the 2016 U.S. presidential election, including allegations of collusion between the Trump campaign and the Russians.
>
> The subpoenas directed DOJ and FBI to produce any and all documents relating to the agencies' relationship with former British Secret Intelligence Service officer Christopher Steele and/or the so-called "Trump Dossier," including those memorializing FBI's relationship with Mr. Steele, any payments made to Mr. Steele, and efforts to corroborate information provided by Mr. Steele and his sub-sources—whether directly or via Fusion GPS.  The subpoenas also directed DOJ and FBI to provide copies of any Foreign Intelligence Surveillance Act (FISA) applications submitted to the Foreign Intelligence Surveillance Court (FISC)—whether or not approved by the FISC—incorporating information provided by Mr. Steele, his sub-sources, and/or Fusion GPS.

Plaintiff's letter pointed out the lack of cooperation he had received in 2017 in obtaining responses to Russia-investigation related requests:

---

[7]       Fusion GPS' client or clients in the latest campaign to obstruct justice are unknown to Plaintiff without discovery.

Resort to compulsory process was necessary because of DOJ's and FBI's insufficient responsiveness to the Committee's numerous Russia-investigation related requests over the past several months.  On multiple occasions, through written requests and direct engagements, the Committee has sought but failed to receive responsive testimony or documents from DOJ and FBI.  For example, to date the Committee has not received a meaningful response to its May 9, 2017, request to Attorney General Sessions.  Additionally, on May 16, 2017, the Committee sent a letter asking then-Acting Director Andrew McCabe to participate in a voluntary interview, and produce relevant documents. The Committee received no reply until May 27—more than two months later—when DOJ declined the interview request and indicated that "the Department is not prepared to respond further to your request at this time."

44.    On October 4, 2017, Plaintiff, in his capacity as Chairman of the House Intelligence Committee, authorized subpoenas for documents and to compel testimony from Simpson and his Fusion GPS partners Peter Fritsch[8] and Thomas Catan.[9] https://www.cnn.com/2017/10/10/politics/fusion-gps-subpoenas-devin-nunes/index.html; https://www.cnn.com/2017/10/18/politics/fusion-gps-partners-plead-fifth-before-house-intel/index.html (noting that Fusion GPS' attorney revealed that Fritsch and Catan invoked their Fifth Amendment rights not to answer questions before the Committee)].

---

[8]    Fritsch is a co-founder of Fusion GPS and partner of Simpson's.  Fritsch was responsible for running opposition research for Fusion GPS on Theranos. [https://www.washingtonpost.com/investigations/journalism-for-rent-inside-the-secretive-firm-behind-the-trump-dossier/2017/12/11/8d5428d4-bd89-11e7-af84-d3e2ee4b2af1_story.html ("Fusion GPS bills itself as a corporate research firm, but in many ways it operates with the secrecy of a spy agency … Fusion worked to blunt aggressive reporting on the medical-device company Theranos, which was later found to have problems with its novel blood-testing technology.  It was also hired to ward off scrutiny of the nutritional supplement company Herbalife, which ultimately paid $200 million to distributors to settle claims by regulators … Fusion's work on the dossier went beyond ordinary opposition research, the kind that might explore a candidate's past legislative history or embarrassing gaffes — known in the industry as "votes and quotes." Instead, it paid a former British spy to compile intelligence from unnamed Russian sources.")].

[9]    Catan is the third partner of Fusion GPS.  Like Simpson and Fritsch, he used to work for the Wall Street Journal. [https://www.wsj.com/news/author/thomas-catan].

45.     Plaintiff also issued a subpoena to Fusion GPS' bank for the company's financial records.  Fusion GPS sought a temporary restraining order and preliminary injunction to block release of the bank records.  Fusion GPS failed in its effort to prevent disclosure of the bank records. *Bean, LLC v. John Doe Bank*, 291 F.Supp.3d 34 (D. D.C. 2018).  The bank records produced by Fusion GPS confirmed that the Clinton campaign, the DNC and Perkins Coie paid for Fusion GPS' anti-Trump research. [https://thehill.com/homenews/house/354796-nunes-signs-off-on-new-subpoenas-in-russia-investigation; https://www.washingtonexaminer.com/byron-york-in-dossier-probe-fusion-gps-asks-court-to-stop-house-from-seeing-bank-records].

46.     On August 22, 2017, Simpson testified before the Senate Intelligence Committee.  Simpson claimed he originally hired Steele to research Trump's business activities in Russia:

> "I would say that's broadly why I asked him to see what he could find out about Donald Trump's business activities in Russia … I'll just stress that we weren't looking for – at least it wasn't at the forefront of my mind there was going to be anything involving the Russian government per se, at least not that I recall.

https://www.feinstein.senate.gov/public/_cache/files/3/9/3974a291-ddbe-4525-9ed1-22bab43c05ae/934A3562824CACA7BB4D915E97709D2F.simpson-transcript-redacted.pdf (pp. 78-79)].  Simpson's testimony was untruthful.  For instance, the IG Report concluded that Simpson's reasons for hiring Steele included far more than simply research on Trump's "business activities" in Russia:

> "In May 2016, Simpson met Steele at a European airport and inquired whether Steele could assist in determining Russia's actions related to the 2016 U.S. elections, whether Russia was trying to achieve a particular election outcome, whether candidate Donald Trump had any personal and business ties in Russia, and whether there were any ties between the Russian government and Trump and his campaign."

[https://www.justice.gov/storage/120919-examination.pdf (p. 93)].

47.     On November 14, 2017, Simpson testified behind closed doors before the House Intelligence Committee.  He was accompanied by three (3) lawyers.

48.     On January 17, 2018, the House Intelligence Committee published an unclassified, redacted transcript of Simpson's testimony in executive session. [https://docs.house.gov/meetings/IG/IG00/20180118/106796/HMTG-115-IG00-20180118-SD002.pdf].

49.     It was immediately obvious to Representatives and reporters alike that Simpson had lied in his testimony to the House Intelligence Committee. [*See, e.g.*, https://www.powerlineblog.com/archives/2018/01/simpson-tried-to-deceive-congress-on-the-fusion-gps-obama-doj-connection.php ("**SIMPSON TRIED TO DECEIVE CONGRESS ON THE FUSION GPS/OBAMA DOJ CONNECTION**"); https://dailycaller.com/2018/09/17/bruce-ohr-testimony-fusion-gps-glenn-simpson/ ("DOJ official Bruce Ohr testified that he met with Fusion GPS founder Glenn Simpson in August 2016.  That conflicts with what Simpson told a congressional committee in November.  He [Simpson] said he did not meet Ohr until after the 2016 election … Department of Justice (DOJ) official Bruce Ohr told Congress in August that he met before the 2016 election with Glenn Simpson, a direct contradiction to what the Fusion GPS founder said in a congressional deposition in 2017"); https://www.tabletmag.com/jewish-news-and-politics/253004/fusion-gps-donald-trump ("**Did Glenn Simpson Lie to Congress?**");      https://www.washingtontimes.com/news/2018/may/31/glenn-simpson-accused-lying-congress-sen-charles-g/ ("**Why key architect of the anti-Trump dossier is now accused of lying to Congress**")].

50.     In fact, Simpson lied to *both* the House of Representatives *and* the United States Senate about his role and involvement in advancing the anti-Trump smear campaign before and after the 2016 presidential election.   The following testimony by Simpson to the House Intelligence Committee was knowingly and willfully false:

> Q     You've never heard from anyone in the U.S. Government in relation to those matters, either the FBI or the Department of Justice?
>
> A     After the election.   I mean, during the election, no.
>
> Q     What did you hear after and from whom and when?
>
> A     I was asked to provide some information to the Justice Department.
>
> Q     By whom and when?
>
> A     It was by a prosecutor named Bruce Ohr, who was following up. You know, I can't remember when.   It was sometime after Thanksgiving, I think.
>
> Q     Thanksgiving of 2016?
>
> A     Yes.

Simpson also knowingly and willfully lied to the Senate Judiciary Committee.   His statement to the Senate Judiciary Committee on August 22, 2017 that he "had no client after the [2016 presidential] election" was an "outright lie".  As Senator Grassley observed:

> "For example, when the Committee staff interviewed Glenn Simpson in August of 2017, Majority staff asked him: 'So you didn't do any work on the Trump matter after the election date, that was the end of your work?'  Mr. Simpson answered: 'I had no client after the election.'  As we now know, that was extremely misleading, if not an outright lie."

[https://thefederalist.com/2018/12/04/grassley-fusion-gps-founder-ceo-glenn-simpson-lied-senate-testimony/;   https://www.breitbart.com/politics/2018/05/29/grassley-fusion-gps-founder-gave-extremely-misleading-testimony-about-trump-work/].

51.     Simpson knew that there was a substantial likelihood that he could be indicted for making false statements to the FBI and DOJ, lying to Congress and the Senate, and for obstructing justice.  Simpson knew that it was a Federal crime to "corruptly" influence, obstruct, or impede, or endeavor to influence, obstruct or impede the House Intelligence Committee in its Russia investigation.[10]

52.     Fearing a criminal referral for Simpson's false statements to the FBI and DOJ, for lying to Congress and the Senate, and for obstructing the House Intelligence Committee in its Russia investigation, the Defendants directly and aggressively retaliated against Plaintiff, employing the same or similar pattern, practices, means and methods as Fusion GPS and Simpson had employed multiple times in the past to smear the opposition. [*See, e.g., Halvorssen v. Simpson*, Case 2:18-cv-02683-ENV-RLM (E.D.N.Y.) (Document 1) (Simpson creates a phony "dossier" that he passes on to "friendly journalists" and/or associates who use the negative information to smear the target); *see id Crime In Progress, supra*; *and IG Report, supra*].

53.     Defendants' retaliatory actions caused Plaintiff to incur concrete economic and pecuniary loss, including cost and expense to address and defend against Fusion GPS and Simpson's scurrilous accusations.

**6.     _Retaliation Against Plaintiff_**

54.     On January 25, 2018, as news of Simpson's perjury was being widely reported, CfA, acting in concert with Fusion GPS, faxed an "ethics" complaint against

---

[10]     As used in Title 18 U.S.C. § 1505, the term "corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information. *18 U.S.C. § 1515(b)*.

Plaintiff to the Office of Congressional Ethics ("OCE").[11]   The filing of the ethics"

complaint injured Plaintiff in his business as a United States Congressman.   The ethics

complaint falsely accused Plaintiff of retaliating "against Fusion for its role in investigating

President Trump's and the Trump campaign's ties to Russia and to deter the firm from any

engaging in any continued investigation."

55.   The purpose of Defendants' first "ethics" complaint was to threaten and

intimidate Plaintiff, impede his communications with "conservative" members of the press,

chill reporting of Fusion GPS and Simpson's wrongdoing, interfere with Plaintiff's

congressional investigation into Fusion GPS and the "Steele Dossier", and dissuade

Plaintiff from making criminal referrals to the DOJ.

56.   On February 2, 2018, President Trump declassified a memorandum

prepared by House Intelligence Committee staff (the "Nunes Memo") that discussed FISA

abuses at the DOJ and FBI.   The Nunes Memo began as follows:

---

[11]   In addition to CfA, Fusion GPS and Simpson ran numerous other political
operations against Plaintiff using McClatchy, Mair, Swamp, ADLF and others.   All
coordinated operations were designed to impede Plaintiff's congressional investigation.

UNCLASSIFIED ~~/SECRET/NOFORN~~

January 18, 2018

Declassified by order of the President
February 2, 2018

To:        HPSCI Majority Members

From:      HPSCI Majority Staff

Subject:   Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the
           Federal Bureau of Investigation

**Purpose**

  This memorandum provides Members an update on significant facts relating to the
Committee's ongoing investigation into the Department of Justice (DOJ) and Federal Bureau of
Investigation (FBI) and their use of the Foreign Intelligence Surveillance Act (FISA) during the
2016 presidential election cycle.  Our findings, which are detailed below, 1) raise concerns with
the legitimacy and legality of certain DOJ and FBI interactions with the Foreign Intelligence
Surveillance Court (FISC), and 2) represent a troubling breakdown of legal processes established
to protect the American people from abuses related to the FISA process.

Upon publication of the Nunes Memo, Fusion GPS and Simpson stepped up their efforts

to interfere in and obstruct Plaintiff's investigation.

57.      On March 1, 2018, CfA faxed a second "ethics" complaint against Plaintiff

to OCE.  This time, CfA falsely accused Plaintiff and staff members acting at his direction

of having leaked to the press private text messages between Senator Mark Warner and

Adam Waldman, a lawyer connected to Steele, in which Senator Warner tried to arrange a

meeting with Steele.

58.      Defendants' intended goal was to undermine confidence in Plaintiff, harass

and overwhelm him with litigation, and distract him from his business and duties as

Chairman of the House Intelligence Committee.

59.      In addition to the ethics complaints, Fusion GPS and Simpson created a

"dossier" on Plaintiff, parts of which they used to create scandal and improperly interfere

with and obstruct Plaintiff's investigation of Fusion GPS and Simpson.

30

60.     In or before May 2018, Fusion GPS approached McClatchy – a media outlet with a known axe to grind against Plaintiff – and collaborated with McClatchy to publish a scandalous Fusion GPS "dossier" about Plaintiff's involvement with a yacht, cocaine and prostitutes.  As Simpson and Fritsch admitted in *Crime in Progress*, Fusion "found an obscure bit of litigation" involving an employee of the Alpha Omega Winery.  Simpson knew from FEC filings that Plaintiff had a small investment in Alpha Omega Winery. Fusion GPS and Simpson used the litigation, which did not in any way involve Plaintiff, to manufacture a story that made it appear as if Plaintiff was involved with cocaine and underage prostitutes.   McClatchy agreed to publish the "dossier" ___**both**___ in print in newspapers, ___**and**___ online via its websites, including www.fresnobee.com and www.mcclatchydc.com/, ___**and**___ to the Twitter universe.

61.     On May 23, 2018, within weeks of the June 2018 Congressional primary, McClatchy published the following article:



[https://www.fresnobee.com/news/business/article210912434.html].[12]   In furtherance of

the scheme to injure Plaintiff, McClatchy employed social media to republish the

Yacht/Cocaine/Prostitutes article to the widest possible audience.   Fusion GPS and

---

[12]      The timing of McClatchy's publication of the Yacht/Cocaine/Prostitutes article on May 23, 2018 demonstrates that the article was part of a larger agenda to harm Plaintiff.   Fusion GPS and McClatchy published the article during the 2018 Congressional election campaign, just weeks before the June 5, 2018 primary.   The story was not "news" in 2018, however.   As was well-known to Fusion GPS and Simpson from their research on Plaintiff, the incident aboard the yacht in 2015 and the litigation that followed were extensively reported on by *Winebusiness* in 2016.   *Winebusiness* is a monthly magazine with a distribution throughout North America.   It is the leading producer of information, events and resources for the wine industry in the United States. [https://www.winebusiness.com/news/?go=getArticle&dataid=176634].    *Winebusiness*' coverage of the incident aboard the yacht was a matter of common knowledge, for instance, on Twitter. [*E.g.*, https://twitter.com/msgoddessrises/status/845320410493206529].

McClatchy coordinated messaging with the common goal to make it appear that Plaintiff was connected to the event aboard the yacht.  McClatchy and its reporter, Mackenzie Mays, spared no expense in misrepresenting basic facts:



**Mackenzie Mays**
@MackenzieMays

A woman who worked for the winery (listed as a primary asset of Devin Nunes') sued after she said she was stranded on a yacht with its top investors who were using cocaine and underage sex workers. The cruise was auctioned off as part of a charity event.

[https://twitter.com/MackenzieMays/status/999366435368398848].[13]

62.     As was intended by Fusion GPS and Simpson, the defamatory implication (the gist) of the Yacht/Cocaine/Prostitutes story was immediately evident from the prominent placement of Plaintiff's name alongside "prostitutes" and "cocaine" in the story's headline ("**A yacht, cocaine, prostitutes: Winery partly owned by Nunes sued after fundraiser event**").  The defamatory meaning of the article was clearly understood by all who read and saw the publication.  For instance, NBC News, Capitol Hill

---

[13]     First, Plaintiff's investment in the Alpha Omega Winery was not listed anywhere as a "primary asset of Devin Nunes'".  Second, the name of the yacht is the USS Alpha Omega.  McClatchy intentionally concealed from readers the fact that the yacht is **_not_** owned by the Alpha Omega Winery.  Finally, the Fusion "dossier", repeated by McClatchy, falsely stated that the guests on board the yacht were 25 of the Winery's "top investors".  In truth, Fusion GPS and Simpson knew that the individuals on the yacht were not affiliated with the Alpha Omega Winery in any way.  In November 2016, the Winery publicly stated that "**[n]o one in the group had any personal or business connection to the winery or its owners**, and no Alpha Omega staff knew anyone in the group." [https://www.winebusiness.com/news/?go=getArticle&dataid=176634 (emphasis added)].

Correspondent, Kasie Hunt ("Hunt"), who had 421,500 followers on Twitter in May 2018, stated as follows:



**Kasie Hunt** ✓
@kasie

Sex with prostitutes (including public ratings of their services) and cocaine on a yacht party thrown by winery partly owned by Devin Nunes

Managing partner and owner is Nunes friend; winery says Nunes is totally uninvolved in day to day decisions

[*See id.,* https://www.youtube.com/watch?v=gIc_16_vaH4 (Raw Stories – "Devin Nunes just got caught up in a disgusting yacht, cocaine, prostitute scandal"); https://twitter.com/DavidCayJ/status/1049287537137782784 ("Underage hookers, cocaine & @DevinNunes – a story never denied by winery that paid a hush money settlement.  The Fresno politician works to ensure there is no serious Congressional investigation of Putin's illegal aid to Trump campaign").

63.     On June 7, 2018 – two days after Nunes won the primary election – the American Democracy Legal Fund ("ADLF"), a left-wing, non-profit organization founded by Democratic political operative, David Brock ("Brock"), filed an "ethics" complaint against Plaintiff based upon statements published on May 23, 2018 by McClatchy and Fusion GPS.  The Brock/ADLF "ethics" complaint lacked any evidentiary support and was premised on a mere "possibility" – raised by Fusion GPS and McClatchy – that Plaintiff was on board a yacht in 2015 with cocaine and prostitutes.

34

64.     On July 11, 2018, CFA filed a third "ethics" complaint with OCE, this time falsely stating that Plaintiff "violated federal law and House ethics rules by failing to include information on his personal financial disclosure forms and accepting an impermissible gift."  An accompanying press release published on CfA's website contained the following defamatory clickbait headline:

# Ethics Complaint Against Rep. Devin Nunes for Lying About His Investments in Several California Companies

[https://campaignforaccountability.org/work/ethics-complaint-against-rep-devin-nunes-for-lying-about-his-investments-in-several-california-companies/].

65.     CfA's third ethics complaint was the result of a joint effort that included Michael Seeley ("Seeley"), a political activist and long-time member of Southern California Americans for Democratic Action ("SCADA"), a left-wing, populist political organization committed to liberal politics, liberal policies, and a liberal future. [https://www.adasocal.org/board_members_1].  Upon information and belief, Fusion GPS and/or CfA directed Seeley to make a request under the California Public Records Act ("PRA") for emails received by Plaintiff's wife, Elizabeth, an elementary school teacher. Seeley's request targeting Plaintiff's wife ended up costing the Tulare County Office of Education thousands of dollars in unnecessary cost and expense.  Seeley published Elizabeth Nunes' emails online and included the names and email addresses of numerous school administrators and teachers, resulting in extensive harassment of these innocent, hard-working citizens of Tulare County, including hateful accusations that they teach bigotry and racism. [https://www.scribd.com/user/399236302/Michael-Seeley].  In fact,

the school was so concerned about security problems resulting from this situation that it adopted enhanced security measures.  The tactics employed by Seeley are the same as those utilized by Fusion GPS in the obstructions schemes against Halvorssen, Boyd and Browder.

66.     Fusion GPS and Simpson concealed the fact that they were on CfA's payroll.  On August 1, 2019, Plaintiff learned that CfA paid Fusion GPS almost $140,000 in 2018 to conduct unspecified "research".  [https://dailycaller.com/2019/08/01/liberal-watchdog-fusion-gps-trump/ ("**Liberal Watchdog Group That Targeted Google And Devin Nunes Paid Fusion GPS $140K For Research**")].

67.     In addition to CfA, Fusion GPS, upon information and belief, recruited additional bad actors, including Virginia political operative Liz Mair, and encouraged and enticed them to participate in the coordinated attacks upon Plaintiff.  Mair works for anonymous, dark money clients.  In her own words, she "anonymously smear[s]" her clients' opposition "on the internet".  [https://www.linkedin.com/in/liz-mair-76b03a2/ ("What do I do for these clients?  Anonymously smear their opposition on the Internet.")].  Mair controls the Swamp Accountability Project ("Swamp"), a dark money group run out of Alexandria, Virginia.  On the same day CfA filed its third complaint, Swamp filed an "ethics" complaint against Plaintiff. [https://swampaccountabilityproject.com/letter/].  It was no coincidence.  It was, as Mair boasts, a planned and extremely well-organized smear campaign.  The organized and coordinated attacks on Plaintiff bear all the hallmarks of a Fusion GPS smear operation.

68.     The purpose of the coordinated "ethics" complaints and Yacht/Cocaine/Prostitutes article was to create negative publicity for Plaintiff, to harass,

intimidate and distract Plaintiff, to cast a pall upon the Congressional investigation into the role that Fusion GPS, Simpson and the Steele/Fusion "dossier" played in advancing the "Russia collusion" narrative, and to dissuade Plaintiff from pursuing criminal charges against Simpson and Fusion GPS.  Just as they had done with Halvorssen, Boyd, Browder and many others, Fusion GPS and Simpson, acting in concert with non-profits and "friendlies" in the media, coordinated the attacks on Plaintiff.  Fusion GPS and Simpson gave a "dossier" to McClatchy.  Each of the "ethics" complaints filed against Plaintiff was leaked to McClatchy and immediately reported by McClatchy in the *Fresno Bee*. [*E.g.*, https://www.fresnobee.com/news/politics-government/politics-columns-blogs/political-notebook/article214693435.html].

69.    CfA, McClatchy, ADLF and Mair combined, associated and agreed with Fusion GPS and Simpson to weaponize the media and ethics process against Plaintiff in order to injure Plaintiff in his business as a United States Congressman.   The Yacht/Cocaine/Prostitutes article was a blatant hit piece.  The "ethics" complaints, reported by media sympathizer McClatchy as if legitimate, were, in fact, deceitful political attacks designed to intimidate Plaintiff and obstruct his congressional investigations.

**B.**    ***Plaintiff's Injuries***

70.    As a direct and proximate result of Fusion GPS and Simpson's efforts to interfere with, impede and obstruct Plaintiff in the performance of his official duties as Chairman of the House Intelligence Committee, Plaintiff suffered injury in fact to his business as a United States Congressman. *See Potomac Elec. Power Co. v. Electric Motor and Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001) ("The best reading of § 1964(c)'s injury to business or property requirement is that it refers to the fact of injury and not the

amount"); *D'Addario v. D'Addario*, 901 F.3d 80, 96 (2ⁿᵈ Cir. 2018) ("We have long recognized that a plaintiff may recover legal fees, including expenses incurred in one or more attempts to combat a defendant's RICO violations through the legal system, as damages in a civil RICO action.").  Plaintiff incurred legal fees and administrative expenses, including costs to research, travel, consult, and publicly address the obstruction scheme and smear campaign promoted by the Defendants and their confederates.  The sum of these out-of-pocket expenses paid by Plaintiff through his campaign is estimated, upon information and belief, to be not less than $25,000.00.[14]

71.    But for Fusion GPS and Simpson's racketeering activity, Plaintiff would not have been injured and would not have incurred these costs and expenses.

### COUNT I – <u>VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)</u>

72.    Plaintiff restates paragraphs 1 through 71 of this Second Amended Complaint and incorporates them herein by reference.

73.    Fusion FPS and Simpson are each a "person" as that term is defined in Title 18 U.S.C. § 1961(3).

74.    The enterprise, consisting of Fusion GPS, Simpson, CfA, Mair, McClatchy and other unnamed clients, officers, executives, and employees of Fusion GPS, CfA, Mair and McClatchy associated in fact, is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4).  The persons involved in the enterprise associated for the common purpose of obstructing justice.  The enterprise in this case has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and

---

[14]    In the absence of proof of a specific amount of damage caused by Defendants' racketeering activity, Plaintiff is entitled to nominal damages, which would trigger an award of attorney's fees. *PEPCO*, 262 F.3d at 266.

responsibilities.  Fusion GPS and Simpson created the "dossier" to be used to facilitate the obstruction scheme.  As an "astroturfer", Fusion GPS and Simpson chose CfA, Mair and McClatchy as fronts or "cut-outs" to undertake the obstruction scheme.  Fusion GPS and Simpson operated the enterprise and controlled the specific means and methods employed by the enterprise, the nature and timing of the obstruction launched in January 2018, and they pursued a common goal of intimidation and harassment.

75.     Between 2017 and 2018, while associated with an enterprise engaged in activities that affected interstate commerce, Fusion GPS and Simpson conducted the business of the enterprise (obstruction of justice) through multiple acts of racketeering activity which injured Plaintiff's business by interfering with and obstructing Plaintiff's Congressional investigations and duties:

a.      Fusion GPS and Simpson corruptly and by threatening letters or communications influenced, obstructed and impeded, or endeavored to influence, obstruct or impede, the due administration of justice in violation of Title 18 U.S.C. § 1503(a).

b.      Fusion GPS and Simpson knowingly used intimidation, threatened, and attempted to corruptly persuade Plaintiff, and engaged in misleading conduct toward Plaintiff with the intent to influence, prevent or delay the testimony of Plaintiff, other members of the House Intelligence Committee, and other third-parties in an official proceeding in violation of Title 18 U.S.C. § 1512(b)(1).  Fusion GPS and Simpson also knowingly used intimidation, or attempted to do so, and engaged in misleading conduct toward Plaintiff with the intent to cause or induce Plaintiff to withhold one or more criminal referrals to the DOJ in violation of Title 18 U.S.C. § 1512(b)(2).

c.      Fusion GPS and Simpson intentionally harassed Plaintiff and thereby hindered, delayed, prevented or dissuaded Plaintiff and other members of the House Intelligence Committee, or attempted to do so, from (a) reporting to a law enforcement officer of the United States, including the FBI and/or DOJ, the commission or possible commission of Federal offenses, (b) seeking the arrest of Simpson, other officers and employees of Fusion GPS, and/or Steele, and (c) causing a criminal prosecution to be sought or instituted, in violation of Title 18 U.S.C. § 1512(d)(2-4).

d.      Fusion GPS and Simpson knowingly, with the intent to retaliate, took action harmful to Plaintiff, including interference with Plaintiff's lawful employment and livelihood as a U.S. Congressman, for providing to a law enforcement officer truthful information relating to the commission or possible commission of a Federal offense by Fusion GPS, Simpson and/or other officers and employees of Fusion GPS in violation of Title 18 U.S.C. § 1513(e).

e.      Fusion GPS and Simpson, together with Orbis and Steele, corruptly created and supplied a fraudulent document – the "Steele Dossier" – and made false statements to the FBI, DOJ, State Department, and to Congress for the express purpose of influencing the outcome of the 2016 U.S. Presidential election and, thereafter, to topple a sitting President.  In his capacity as a United States Congressman, Plaintiff investigated the allegations of "collusion" between the Trump campaign and persons associated with it and Russia.  Plaintiff investigated the role of Fusion GPS, Simpson and the "Steele Dossier" in advancing the "Russia collusion" narrative.  Plaintiff discovered that Fusion GPS and Simpson committed multiple federal crimes, including violations of Title 18 U.S.C. §§ 1001 and 1505.  Through a pattern of racketeering activity that, *inter alia*, involved acts of

40

wire fraud in violation of 18 U.S.C. § 1343 and obstruction of justice in violation of Title 18 U.S.C. §§ 1503, 1512 and 1513, the Defendants engaged in concerted action the purpose of which was to harass, intimidate, influence, obstruct and impede Plaintiff's investigation, to dissuade Plaintiff from making a criminal referral, and to undermine Plaintiff's ability to do his job as Chairman of the Committee.

76.     Defendants have engaged in at least two acts of racketeering activity, one of which occurred after the effective date of Part 1, Chapter 96 of Title 18 of the United States Code and the last of which occurred within ten years after the commission of a prior act of racketeering activity.

77.     As described above, Plaintiff has been injured in his business by reason of Defendants' multiple violations of Title 18 U.S.C. § 1962, described above.  In addition to concrete out-of-pocket losses, Defendants' actions injured Plaintiff's standing among colleagues and constituents, as reflected in the results of the 2018 congressional election, as a direct and proximate cause of Defendants' actions.  Defendants proximately caused Plaintiff's injuries.  Their collusion to smear Plaintiff and to obstruct his congressional investigation of Fusion GPS and the "Steele Dossier" and their actions in levelling the fraudulent "ethics" complaints and publishing the Yacht/Cocaine/Prostitutes article led directly to Plaintiff's injuries.  Plaintiff's injuries flow from the Defendants' predicate acts. *Compare Noble Sec., Inc. v. MIZ Engineering, Ltd.*, 611 F.Supp.2d 513, 552 (E.D. Va. 2009) ("plaintiff alleged that it was injured in its business by stating that: 'due to the purposefully injurious conduct ... [Noble] [has] been intentionally and irreparably harmed.' That alleged injury was attributed to the RICO violation because Noble alleged that: 'Third Party Defendants have successfully conducted a business enterprise to injure [Noble's]

business through a pattern of racketeering activity.'  Therefore, Noble has sufficiently

alleged subject matter jurisdiction").

78.     Defendants continue to engage in related racketeering activity, the direct

purpose of which is to intimidate and harm Plaintiff and to interfere with his congressional

investigation, which continues.   The nature of the Defendants' racketeering activity

(including its multiple schemes or artifices), its continuity (over many years), its

relatedness (same *modus operandi* as has been used against multiple other targets, same

media sympathizer, McClatchy, same or similar purposes, results, and methods of

commission), and its breadth (the sheer number of victims), is such that there is a threat

that it will continue indefinitely and be repeated in the future.   Defendants' past

misconduct, including aggressive smear campaigns undertaken against Halvorssen, Boyd,

Browder, Trump and Plaintiff, by its nature projects into the future with the threat of

repetition.   Indeed, Fusion GPS was paid $3,300,000 in 2017 to continue the campaign

against President Trump.

79.     In accordance with 18 U.S.C. § 1964(c), Plaintiff sues for and seeks to

recover threefold the damages he has sustained, the costs of this suit, and reasonable

attorney's fees incurred.

### COUNT II – RICO CONSPIRACY, 18 U.S.C. § 1962(d)

80.     Plaintiff restates paragraphs 1 through 79 of this Second Amended

Complaint and incorporates them herein by reference.

81.     Beginning in or about January 2018 and continuing through the present,

Fusion GPS and Simpson conspired, combined, associated, agreed or acted in concert with

CfA, Mair, McClatchy and others for the express purposes of injuring Plaintiff in his

business as Chairman of the House Intelligence Committee and as a United States Congressman through a pattern of racketeering activity and acts of racketeering in violation of Title 18 U.S.C. § 1962(c). Fusion GPS and Simpson specifically agreed to facilitate the unlawful activity by undertaking the research and creating "dossiers" on Plaintiff that CfA, Mair and McClatchy then published on the Internet, via social media and to OCE to obstruct Plaintiff in the performance of his duties.

82.     Defendants knew about, indeed they orchestrated the overall objective and goal of the scheme to obstruct justice. Defendants acted intentionally, purposefully, without lawful justification, and with the express knowledge that they were injuring Plaintiff's business and standing as Chairman of the Committee.

83.     As a direct and proximate cause of the Defendants' violations of Title 18 U.S.C. § 1962(d), Plaintiff suffered injury and loss.

84.     In accordance with 18 U.S.C. § 1964(c), Plaintiff sues for and seeks to recover threefold the damages he has sustained, the costs of this suit, and reasonable attorney's fees incurred.

## COUNT III – DECLARATORY AND INJUNCTIVE RELIEF, 18 U.S.C. § 1964(a)

85.     Plaintiff restates paragraphs 1 through 84 of this Second Amended Complaint and incorporates them herein by reference.

86.     There is an actual case and controversy between the parties over whether Fusion GPS and Simpson engaged in acts of "racketeering activity" when, in conspiracy and concert with Perkins Coie, the DNC and the Hillary Clinton campaign, they manufactured and used the Steele "dossier" and when they collaborated with CfA, Mair

and McClatchy to publish the fraudulent "ethics" complaints and the Yacht/Cocaine/Prostitutes article.

87.     For the reasons stated above, and to be developed by additional evidence in Fusion GPS and Simpson's exclusive possession, Fusion GPS and Simpson's conduct constitutes racketeering activity as defined in Title 18 U.S.C. § 1961(1).  Fusion GPS and Simpson dispute this contention.  They maintain that their conduct is not intended to obstruct justice and does not constitute obstruction of justice.

88.     For almost a decade, Fusion GPS and Simpson have committed crimes of obstruction against multiple victims, including Halvorssen, Boyd, Browder, Trump and Plaintiff.  Their criminal conduct continues to date, and will be repeated again and again in the future to the detriment of Plaintiffs and other targets of the paying clients of Fusion GPS.

89.     Accordingly, Plaintiff seeks injunctive relief from the Court pursuant to Title 18 U.S.C. § 1964(a), including but not limited to an order: (1) prohibiting Fusion GPS and Simpson from continuing to obstruct justice by creating fake "dossiers" and engaging in media campaigns designed to injure the business, property and reputation of the target, (2) to order the dissolution or reorganization of Fusion GPS so as to prevent or restrain the Defendants from committing fraud, lying to the FBI, DOJ, Congress and Senate, obstructing justice, and violating Title 18 U.S.C. § 1962 in the future.

## COUNT IV – <u>TORTIOUS INTERFERENCE</u>

90.     Plaintiff restates paragraphs 1 through 89 of this Second Amended Complaint and incorporates them herein by reference.

91.     As a United States Congressman, Plaintiff had a valid contract and reasonable business expectancies in his employment and position.  Through its in-depth research and creation of a "dossier" on Plaintiff, Fusion GPS and Simpson both knew about Plaintiff's business, employment and property rights.

92.     Fusion GPS and Simpson intentionally interfered with Plaintiff's business expectations and property rights by, *inter alia*, creating and undertaking a scheme to obstruct justice and by publishing false and defamatory statements about Plaintiff with the clear intent to cause Plaintiff's termination as Chairman of the Committee and removal from Congress.  Fusion GPS and Simpson's improper methods, actions and practices were, *inter alia*, illegal, defamatory, unethical, oppressive, over-reaching, fraudulent, hostile, and sharp.

93.     As a direct result of the Defendants' willful misconduct, Plaintiff suffered damage and incurred presumed damages and actual damages, including, but not limited to, injury to his business and reputation, insult, embarrassment, humiliation, pain and mental suffering, court costs, and other damages.

## COUNT V – <u>COMMON LAW CONSPIRACY</u>

94.     Plaintiff restates paragraphs 1 through 93 of this Second Amended Complaint and incorporates them herein by reference.

95.     The Defendants' actions, detailed above, constitute a conspiracy at common law to tortiously interfere with Plaintiff's business as a United States Congressman and, in particular, his position as Chairman of the House Intelligence Committee.[15]

---

[15]     Plaintiff's business as a United States Congressman is no different that the business of the plaintiff attorney in *Daniczek v. Spencer*, 156 F.Supp.3d 739, 766 (E.D. Va.

45

96.     As a direct result of the Defendants' willful misconduct, Plaintiff suffered

damage and incurred presumed damages and actual damages, including, but not limited to,

injury to his business and reputation, insult, embarrassment, humiliation, pain and mental

suffering, court costs, and other damages.


Plaintiff alleges the foregoing based upon personal knowledge, public statements

of others, and records in his possession.   Plaintiff believes that substantial additional

evidentiary support, which is in the exclusive possession of the Defendants and their agents

and other third-parties, will exist for the allegations and claims set forth above after a

reasonable opportunity for discovery.

Plaintiff reserves his right to amend this Complaint upon discovery of additional

instances of the Defendants' wrongdoing.


## CONCLUSION AND REQUEST FOR RELIEF

Fusion GPS, Simpson and Steele fraudulently developed the Steele/Fusion

"dossier" and disseminated it to U.S. Government officials and the press as if the salacious

accusations were true.  Plaintiff investigated this wrongdoing, causing Fusion GPS and

Simpson to retaliate against him and to take action that was intended to harass, intimidate

and influence Plaintiff in the performance of his congressional investigation.  That

retaliation and obstruction of justice consisted of a coordinated effort by the Defendants to

manufacture "ethics" complaints against Plaintiff and to utilize the press (McClatchy) as a

---

2016) ("Danjczek appears to be a solo practitioner, meaning that it is impossible to damage
her reputation without injuring her business").

weapon to pressure Plaintiff to back off his investigation of Fusion GPS and Simpson. Defendants' corrupt acts of racketeering are part of their regular way of doing business. That way of doing business must end here and now.

WHEREFORE, Plaintiff respectfully requests the Court to enter Judgment against Fusion GPS and Simpson, jointly and severally, as follows:

A.     Compensatory damages in the amount of $3,300,000 or such greater amount as is determined by the Jury;

B.     Threefold damages in the sum of $9,900,000.00;

C.     Punitive damages in the amount of $350,000 or the maximum amount allowed by law;

D.     Disgorgement of all income and profit obtained by the enterprise from or as a result of the alleged racketeering activity;

E.     Declaratory and Injunctive relief in accordance with Title 18 U.S.C. § 1964(a);

F.     Dissolution and/or reorganization of Fusion GPS to prevent these Defendants from engaging in wrongdoing in the future;

G.     Prejudgment interest at the maximum rate allowed by law;

H.     Postjudgment interest on the principal sum of the Judgment entered against Google from the date of Judgment until paid;

I.     Attorney's Fees, Expert Witness Fees and Costs;

J.     Such other relief as is just and proper.

**TRIAL BY JURY IS DEMANDED**

DATED:        April 6, 2020


DEVIN G. NUNES


By:___*/s/ Steven S. Biss*_____
        Steven S. Biss (VSB # 32972)
        300 West Main Street, Suite 102
        Charlottesville, Virginia 22903
        Telephone:      (804) 501-8272
        Facsimile:      (202) 318-4098
        Email:          **stevenbiss@earthlink.net**

        *Counsel for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 6, 2020 a copy of the foregoing was filed electronically

using the Court's CM/ECF system, which will send notice of electronic filing to counsel

for the Defendants and all interested parties receiving notices via CM/ECF.


By:    */s/ Steven S. Biss*
               Steven S. Biss (VSB # 32972)
               300 West Main Street, Suite 102
               Charlottesville, Virginia 22903
               Telephone:    (804) 501-8272
               Facsimile:    (202) 318-4098
               Email:        **stevenbiss@earthlink.net**

               *Counsel for the Plaintiff*